RANDY S. GROSSMAN
United States Attorney
ALEXANDRA F. FOSTER/JOSEPH S. GREEN
Assistant United States Attorneys
D.C. Bar No. 470096/CA Bar No. 251169
United States Attorney's Office
880 Front Street, Room 6293
San Diego, California 92101
Telephone: (619) 546-6735/6955

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No. 19CR4488-JLS |
|---|---|
| Plaintiff, | |
| v. | **OPPOSITION TO MOTION FOR DISCOVERY TO IDENTIFY AND RELEASE TRIAL WITNESS AND/OR ALLEGED VICTIMS' INFORMATION AND TO REMOVE ALL REDACTIONS IN THE DISCOVERY RELATED TO TRIAL WITNESSES AND/OR ALLEGED VICTIMS** |
| MATTHEW ISAAC WOLFE (2), | |
| Defendant. | |
| | Date: Feb. 11, 2022<br>Time: 2:00 p.m.<br>Judge: Hon. Janis L. Sammartino |

COMES NOW the UNITED STATES OF AMERICA, by and through its counsel, Randy S. Grossman, United States Attorney, and Alexandra F. Foster and Joseph S. Green, Assistant United States Attorneys, hereby files its Response in Opposition to the above-referenced motion. This Response is based upon the files and records of the case.

**I. STATEMENT OF THE CASE**

As relevant to this motion, the statement of the case is as follows: Defendant Matthew Wolfe was arrested on a complaint on October 10, 2019. He appeared before the magistrate judge on the same day. On October 17, 2019, the parties filed a joint motion for a protective

order. The Court signed the order on the same day, and the Government started providing multiple rounds of voluminous discovery to counsel on a rolling basis thereafter.[1] On November 6, 2019, the Government unsealed an indictment, charging Wolfe with multiple sex trafficking offenses, in violation of 18 U.S.C. Sections 1591 and 1594. The indictment listed one minor victim and five adult victims as MV1 and Victims 1 through 5.[2] The Defendants were arraigned on November 7, 2019.

On November 13, 2019, AUSA Green emailed defense counsel in the case, including Wolfe's counsel, the names of Victims 1 through 5.[3] On November 12, 2021, this Court set this matter for trial on June 20, 2022.

On January 25, 2022, Wolfe filed his motion for discovery to identify and release trial witness and/or alleged victims' information and to remove all redactions in the discovery related to trial witnesses and/or alleged victims ("Def. Mot."). The Government now responds.

**II. STATEMENT OF FACTS**

This Court is aware of many of the facts in this case, having handled Wolfe's detention appeal and co-Defendant Ruben Andre Garcia (3)'s sentencing. Nonetheless, the Government will set out the facts

---

[1] The discovery was redacted to remove victims' names and their identifying information. Nothing else was redacted. To the extent that Defendant identifies additional information that was redacted, the Government stands ready to fix the mistake.

[2] Michael James Pratt (1) is the only defendant charged with counts involving MV1, and she has not been identified, as Pratt is not yet in custody. Wolfe is listed as a defendant for the conspiracy, and Victims 1 and 3 in Counts 1, 4 and 6.

[3] In reviewing the Defendant's motion, it appeared that Wolfe's counsel, Lupe Rodriguez, had not seen this email. Mr. Rodriguez was appointed to represent Wolfe after this email was sent to predecessor counsel. The undersigned forwarded the email to Wolfe's counsel on January 27, 2022.

2

most relevant to this motion.

From at least 2012 through October 2019, Pratt, Wolfe, Garcia, Theodore Gyi, Valorie Moser, and others participated in a conspiracy to recruit young adult women to engage in commercial sex acts by force, fraud or coercion. Over the internet, members of the conspiracy recruited young women from the United States and Canada interested in clothed modeling. Once the young women responded to online ads posted by the conspiracy, conspirators would advise the women that the jobs were actually for pornographic videos, not clothed modeling gigs, and participants, or "models," would receive approximately $3,000 to $5,000 for a video shoot. The women were often told that the video shoot would last no longer than 30 minutes. When presented with this revised offer, many of the women initially refused, often for fear that the videos would be published on the internet and destroy their personal, educational and/or professional lives.

To convince women to appear in the pornographic videos, members of the conspiracy paid women to assure the prospective models that the videos would not be posted on the internet and would only be distributed outside the United States on DVD to supposed private collectors overseas, specifically Australia. Members of the conspiracy assured the women that their friends and families would never learn that the women had appeared in the videos.

If a woman agreed to make a video, she was typically flown to San Diego within a few days. Wolfe initially served as the conspiracy's videographer, before Gyi took on that role. When the women asked, Wolfe and the others maintained the lie and falsely assured the women that

3

their videos would not be posted on the internet. Wolfe and his co-conspirators typically promised that the video of the sex acts was going to a private collector in Australia and would not be posted on the internet. Gyi said that Wolfe instructed him to lie to the women and tell them that the videos would not be posted to the internet when Gyi started working for Pratt and Wolfe in 2015. Garcia, whose job included having sex with the women on camera, frequently offered the young women marijuana or alcohol in the hotel room before Garcia, Gyi or Wolfe would present the woman with a document that she was not allowed to keep. After presenting the woman with the document, Wolfe or one of his co-conspirators falsely paraphrased the contents of the document, and then rushed the women to sign it.

Members of the conspiracy paid the women several thousand dollars for filming, often less than initially promised, citing bruises, cellulite or tattoos. After filming the videos, the women typically flew home the same day, or the next. Some of the women reported that Garcia and/or Wolfe, sexually assaulted them before or after filming. Many of the women also reported that Wolfe and others pressured them to engage in activities outside the scope of what they had agreed to and that, when they protested, Wolfe, and others threatened them with economic repercussions, like cancelling their flight home or saddling them with the hotel bill. Finally, women reported that the video shoot often lasted hours longer than the promised 30 minutes.

Typically, within a few months of filming, Wolfe and others uploaded the videos online to his and Pratt's websites, girlsdoporn.com ("GDP") and/or girlsdotoys.com ("GDT"). Pratt and Wolfe created and

ran GDP and GDT. These two websites offered a fee subscription service. Snippets of the videos were also posted on other sites, such as pornhub.com (the tenth most viewed site on the internet with 3.3 billion monthly viewers, according to statista.com), to drive interest in and web traffic to GDP and GDT. According to financial records, GDP and GDT generated more than $17 million in revenue.

Once the videos went on-line, the victims were harassed and stalked --anonymous social media accounts sent clips of their videos to all of the women's contacts, including friends, parents, siblings, and college classmates. The women's pictures, names, addresses and social media accounts were also posted online around the time the video went up on a website connected to Pratt and Wolfe called www.pornwikileaks.com. Distraught, many women reached out to their GDP recruiters. At Pratt's instruction, the GDP and GDT employees either blocked the women's calls or feigned concern and sent them to a lawyer, who was affiliated with GDP and GDT and did nothing to get the videos taken down from GDP or GDT.

In 2016, multiple aggrieved models filed a civil lawsuit in San Diego Superior Court against Pratt, Wolfe, Garcia, and others, alleging that they tricked them into appearing in pornographic videos posted to GDP. Pratt fled the country in mid-2019, while Wolfe remained integrally involved in his and GDP's civil defense. Wolfe was identified by his civil lawyers as the person most knowledgeable about BLL Media, which was one of GDP's front companies. He testified both in depositions and at trial. Starting in 2012-2013, Wolfe maintained GDP's accounts, uploaded videos to GDP's website, posted ads, fixed

5

GDP's affiliated websites (such as beginmodeling.com), leased office space, handled insurance, and filmed at least 100 GDP videos and 80 to 90% of the solo (GDT) shoots. Wolfe testified that he and Pratt had access to the GDP servers, but if Pratt wanted a document, Pratt would ask Wolfe to find it for him, presumably because Wolfe controlled and oversaw the GDP servers.

On January 2, 2020, San Diego Superior Court Judge Kevin Enright issued a decision, awarding the Plaintiffs over $12 million in damages. In that Statement of Decision, Judge Enright noted that, "Pratt deferred to Wolfe as more knowledgeable on many issues related to his [Pratt's] business." Statement of Decision at 7. He also noted that "Defendants," including Wolfe, were very aware of the numerous websites and forums that existed solely to out and then dox women who had appeared in GDP videos. *Id.* at 35. In fact, as noted earlier, the Defendants -- including Wolfe-- owned and ran one of those websites, Pornwikileaks. Pornwikileaks was a website whose sole purpose was to out the women who appeared in GDP videos by posting their real names, identifiers and personal family histories for internet troll consumption. *Id.* at p. 35-36.

Consistent with their past practices, during the civil suit, Plaintiffs -identified by true name solely to the civil defense team (which included Wolfe)- and their Plaintiffs' lawyers were publicly harassed and humiliated on-line. As described in the Government's Response to Defendant's Appeal of Order Denying Motion to Rescind Detention Order and Set Bail and its exhibits (filed under seal), Wolfe played a role in that harassment. ECF Dkt. No. 95 at 14-16. In the

civil trial, Judge Enright heard testimony about the Defendants' obstructive and intimidating behavior. For example, one witness testified that she had been hired by a GDP employee solely to harass the Plaintiffs' counsel with phone calls every day for $300 per week. Judge Enright found that "Defendants [including Wolfe] have also taken highly unethical actions against Plaintiffs' counsel either in hopes of intimidating them or simply to punish them," including numerous articles making "outrageous" and "false" accusations about the attorneys originally posted on websites controlled by Pratt. Statement of Decision at 43.

During a search of GDP/GDT's office in October, 2019 --months after Pratt had fled and Wolfe had taken charge of the office-- agents found evidence of additional efforts to harass and intimidate the victims and their attorneys:[4]

    a. A video script entitled, "22 Whores + 5 Shady Lawyers VS GirlsDoPorn," with the subheading, "Share and spread this video as far and wide as possible." The script listed the names of the plaintiffs in the civil suit, along with information intended to embarrass, harass and intimidate them, such as: "Put each girls [sic] full name and location on screen before rolling there [sic] shit . . . ." "Final Screen big text These retarded lawyers and disquisting [sic] whores wasted 3 years of everyones [sic] time Ask yourself how viral these videos will go now if nobody is

---

[4] Defendant argued in his Reply to the Government's Opposition that Pratt or another individual were behind these attempts to intimidate the victims and obstruct justice, but Pratt had fled the United States five months earlier, and Wolfe -not Pratt-- was the person in charge of GDP and the office after Pratt fled.

controlling them . . . . Good Job :)."

b. A second video script targeted a particular plaintiff in the civil suit with specific instructions that Defendant Wolfe should be consulted during its production. The document reads, "some of these things u might not know wtf ask wolfy [Defendant] he should."

c. A phone list with the victims' names and Jane Doe numbers that memorialized attempts to get information from them over the telephone by posing as a journalist. The following was handwritten on the back, "Hi My name is [*** ***], I'm a journalist from LA, I'm calling in regards to the girlsdoporn case. I've heard your [sic] related to the case & curious to get a comment if you have the spare time."[5]

On June 14, 2021, this Court handled the sentencing of Ruben Andre Garcia (3). *See* Transcript at ECF Dkt. No. 222. At that time, each victim spoke of her fear of being identified, which was linked to her fear of retaliation, harassment and humiliation. Many of the victims told the Court that they changed their appearance, changed their names, physically isolated themselves, moved repeatedly, and shut themselves off from social media to avoid being found. They also spoke of their emotional fragility – many of them tried to commit suicide, cut themselves, self-medicated with alcohol and drugs, and attended/attend mental health treatment sessions.

**III. ARGUMENT**

The government provides this factual summary to highlight why the

---

[5] Copies of these documents were provided to the Court under seal as exhibits to the Government's motion. The Government could resubmit or provide copies to the Court at the date of the hearing.

victims and potential witnesses (and thus the government) are so sensitive about disclosing any identifying information beyond the names of the victims in the indictment. Even that disclosure was made pursuant to the protective order, which mandates that defense counsel can review discovery with his client but cannot leave a copy of it with the Defendant. *See* ECF Dkt. No. 28, ¶ 2.

The Defendant has a right to a fair trial. Equally compelling are the rights of crime victims and witnesses not to be harassed and humiliated. There is nothing in Fed.Crim.R. 16[6] or the Constitution that requires disclosure of contact information or other identifiers. In fact, the Ninth Circuit has upheld withholding or delaying disclosure depending on the facts of the case. *See United States v. Hernandez*, 608 F.2d 741, 745 (9th Cir. 1979) (considering pre-trial disclosure of a drug informant's identifiers). *See also United States v. Harris*, 501 F.2d 1 (9th Cir. 1974). The court in *Hernandez* held that nondisclosure of an informant's address in pre-trial discovery was justified, where the answer might subject the witness to harassment, humiliation, or danger. See *Hernandez*, 608 F.2d at 745, citing *Harris*, 501 F.2d at 9. The Court "insisted, however, that curtailment of cross-examination into an informant's address must be supported by some indication, provided either by the Government or the witness, why open-court disclosure should be prevented." *Id. See also Barajas v. Wise*, No. 06-15494, 2007 WL 3105756, at *1 (9th Cir. Oct. 22, 2007) (unpublished)

---

[6] Conversely, Fed.Crim.R. 12.1(b)(1)(A)(i) requires that the movant provide contact information for witnesses in alibi cases no later than 14 days before trial and expressly requires that the defense "establish a need for" that information.

(holding, on habeas review, that refusal to disclose past or current addresses was justified, given prosecutor's affidavit that informant was still active in several cases).

Here, the record is rife with a history of repeated harassment and humiliation of the victims that would warrant non-disclosure of the victims' identifiers. This situation is also because the government is directed not to disclose such information. See 18 U.S.C. § 3771 ("Crime victims' rights"). Under subsection (a), crime victims (such as the victims in this sex trafficking case) have:

> (1) The right to be reasonably protected from the accused… [And]
> (8) The right to be treated … with respect for the victim's dignity and privacy.

*Id.* Both the Courts and the prosecutors are responsible for protecting these rights. See 18 U.S.C. § 3771 (d). In short, turning over identifying information concerning these victims runs directly counter to the Government's, and the Courts', obligations under the crime victims' rights statute to maintain the victim's privacy and protect her from the accused.

In this case, the Defendant has the victims' names, and he has made no particularized showing as to why he would need more. He states solely that contact information is necessary "so that proper investigation can be conducted and completed before trial," and to allow for "meaningful access to the discovery." Def. Mot. at 4, 6. The district court has broad discretion to control disclosure of this type of information. *Cf. United States v. W.R. Grace*, 526 F.3d 499, 508-12 (9th Cir. 2008) (en banc) (Court can control timing and disclosure of

witness list). If the Court were inclined to order the government to disclose identifiers or undo redactions, any such identifiers should be restricted to match Defendant's identified need for the information. Further, those disclosures should be made close in time to the trial. Alternatively, as the court did in *Hernandez*, this Court could order the government to make the victims identified in the indictment available to the defense, but only if the victim were amenable to an interview.

**IV. CLOSING**

In closing, the government has and will continue to abide by its discovery obligations. Given the equities in this case, the government has disclosed the names of the victims listed in the indictment but opposes any additional requirements to provide identifiers or remove all redactions in the discovery related to trial witnesses and/or alleged victims.

DATED: February 4, 2022.

*s/ Alexandra F. Foster*
ALEXANDRA F. FOSTER
Assistant U.S. Attorney